**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| N.B. by and through his next friend MAURA MCINERNEY, | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. _____ |
| | : | |
| MONTGOMERY COUNTY, | : | |
| VALERIE ARKOOSH, in her official | : | |
| capacity as Secretary of the | : | |
| Pennsylvania Department of Human | : | |
| Services, and PHOENIX | : | |
| HOUSE, LLC, | : | |
| | : | |
| Defendants. | : | |

## COMPLAINT

### I.      Introduction

1.      Plaintiff N.B., through his next friend Maura McInerney, brings this action against Defendants for excluding him from participation in, or denying him the benefits of the services, programs, and activities offered by Defendants due to his disability of type I diabetes, in violation of the Americans with Disabilities Act (ADA).

2.      Defendants' actions and failure to act have caused Plaintiff to suffer harm and will continue to cause him harm in the future. To redress Defendants' past and continuing violations of Plaintiff's rights under federal law, Plaintiff seeks declaratory and injunctive relief.

II.   **Jurisdiction and Venue**

3.    This Court has jurisdiction over these claims pursuant to 28

U.S.C. §§ 1331 and 1343.

4.    Plaintiff's claims are authorized by 42 U.S.C. §§ 1983, 12133,

and 12188 and 28 U.S.C. §§ 2201 and 2202.

5.    Venue is appropriate in this district pursuant to 28 U.S.C. §

1391(b)(1)–(2) because Defendants Montgomery County and Phoenix

House, LLC (hereinafter "Phoenix House") are located in this District and

Defendant Valerie Arkoosh is a resident of Pennsylvania, and all of the

events and omissions that give rise to the Complaint occurred in this

District.

III.   **Parties**

6.    Plaintiff N.B. is a sixteen-year-old resident of Montgomery

County, Pennsylvania. He brings this action through his next friend, Maura

McInerney.

7.    Plaintiff is adjudicated dependent and both legal and physical

custody of Plaintiff lies with the Montgomery County Office of Children and

Youth ("OCY"), an agency operated by Defendant Montgomery County.

8.    Defendant Montgomery County is a political subdivision

organized and existing under the laws of the Commonwealth of

Pennsylvania. Montgomery County operates the Montgomery County OCY.

9.      Defendant Valerie Arkoosh is the Secretary of the Pennsylvania Department of Human Services ("DHS").

10.     DHS, which is administered by Defendant Arkoosh, is the state agency responsible for administering, overseeing, and regulating Pennsylvania's child welfare system.

11.     Subject to its administration and oversight responsibilities, DHS must ensure that a range of child welfare services are available statewide which meet the needs of the Commonwealth's dependent children.

12.     Defendant Phoenix House is a residential service provider, overseen and licensed by DHS's Bureau of Child and Family Services, that operates a group home for children adjudicated dependent, located at 800 York Road, Cottage #33, Warminster, PA 18974. Defendant Montgomery County contracts with Phoenix House to provide residential services to dependent youth.

## IV.   Facts

13.     After an altercation with his father in October 2023, Plaintiff was placed in the Montgomery County Youth Center ("MCYC"), and Montgomery County OCY was granted temporary physical custody of him.

14.     Plaintiff was thereafter adjudicated dependent and OCY was

granted both legal and physical custody of Plaintiff.

15.     Once it was awarded legal and physical custody of Plaintiff, OCY began searching for an appropriate residential placement for Plaintiff.

16.     On December 1, 2023, OCY placed Plaintiff at Defendant Phoenix House's group home in Warminster.

17.     Prior to his placement at Phoenix House, Plaintiff was treated for type II diabetes.

18.     While Plaintiff lived at Phoenix House, he regularly tested his blood glucose levels and took Metformin to treat his diabetes. Upon information and belief, there were no reported issues with his diabetes care.

19.     On December 7, 2023, Plaintiff was seen by an endocrinologist who determined he did not have type II diabetes but rather, had type I diabetes, which required that Plaintiff begin taking insulin. Plaintiff's doctor admitted Plaintiff to Children's Hospital of Philadelphia ("CHOP") to stabilize him and determine an appropriate dose of insulin. He remained at CHOP for two days.

20.     While at CHOP, Plaintiff received treatment and additional training in diabetes management and was started on injectable insulin, which he continues to take daily.

4

21.     CHOP staff taught Plaintiff how to draw-up and self-administer his insulin injections, as well as how to calculate his required dose of Novolog, which is a fast-acting bolus insulin, in response to his changing blood glucose levels and his ingestion of carbohydrates.

22.     In addition, CHOP taught Plaintiff about the need for him to take a one-time daily dose of Lantus, which is a long-acting, basal insulin.

23.     Since CHOP educated Plaintiff in how to calculate insulin doses, draw them up, and self-administer injections, Plaintiff has been able to do so independently without intervention from adults.

24.     CHOP offered to come and train Defendant Phoenix House's staff in diabetes care and management, but Phoenix House refused this training.

25.     Defendant Montgomery County also offered to provide training resources to Defendant Phoenix House, but Phoenix House turned down the offer of assistance.

26.     Upon Plaintiff's release from CHOP on December 9, 2023, Phoenix House discharged Plaintiff based entirely and explicitly on his need to take insulin to treat his type I diabetes.

27.     Defendant Phoenix House expressed concerns that Plaintiff had a "very new . . . [and] very serious diagnosis that can be deadly if not

monitored properly." Because Defendant "Phoenix [House] is a new program that does not have the staff to do so[,]" it denied Plaintiff participation in its residential program because of his diabetes.

28.    Diabetes was not a "new" diagnosis for Plaintiff; he had already been undergoing treatment for type II diabetes and was familiar with how to treat and monitor the condition, including by testing his blood glucose levels.

29.    The only thing that was "new" to Plaintiff was taking injectable insulin, but he quickly learned how to do this while hospitalized at CHOP.

30.    After Defendant Phoenix House discharged Plaintiff from its program, Montgomery County OCY then placed Plaintiff back in the MCYC, where he remains.

31.    Phoenix House was considerably less restrictive of a placement than is the MCYC.

32.    While at Phoenix House, Plaintiff was able to go outside unsupervised, unlike in the MCYC, where he is required to always be accompanied by staff and can only go out during designated "yard time."

33.    While at Phoenix House, Plaintiff was allowed to have a cell phone, which is very important to a sixteen-year-old and their sense of community; without access to a cell phone at the MCYC, Plaintiff cannot

6

stay connected with his friends. He can only use the phone at limited, designated times and only if he is "on level," meaning he is conforming with the MCYC's behavioral expectations. When allowed to use the phone, Plaintiff can only call select people who are on his call list.

34.    While at Phoenix House, Plaintiff had access to activities and opportunities to socialize with other teens, something he struggles to do in the MCYC, which primarily serves as Montgomery County's youth detention center.

35.    There is nothing for Plaintiff to do at the MCYC besides watch television. There are no games or activities available to the youth at the MCYC such as Plaintiff.

36.    Unlike Phoenix House, the MCYC is behind a fence, and the doors are always locked.

37.    Phoenix House is located directly across the street from the ice hockey rink where Plaintiff's team, the Stingers, play. Plaintiff was able to go to the rink and attend hockey practice while at Phoenix House. While at the MCYC, Plaintiff can only attend practice and games if he is "on level" and his parents are willing and available to transport him.

38.    In all, Plaintiff has lived at the MCYC since October (nearly six months), with the exception of his one week at Phoenix House and his two-

day hospitalization at CHOP.

39.     Medical staff at MCYC do not administer Plaintiff's insulin injections, nor do they test his blood glucose levels; they provide limited supervision of his diabetes management.

40.     Plaintiff takes one injection of Lantus insulin before bedtime, and he takes injections of Novolog insulin as needed, depending on how his blood glucose levels are running and what food he is eating.

41.     Plaintiff tests his blood glucose approximately three times per day.

42.     Plaintiff wears a Dexcom continuous glucose monitor on his upper arm, which constantly monitors his blood glucose levels.

43.     Plaintiff can check his blood glucose levels by looking at the screen on his Dexcom receiver, which is a palm sized device that provides continuous updates and alerts Plaintiff if his blood glucose is either running too high or too low.

44.     The Dexcom system enables Plaintiff to identify problematic blood glucose levels before they occur, and he can therefore respond proactively, greatly decreasing the chances of him experiencing either hyper or hypoglycemia.

45.     Plaintiff understands the importance of safely disposing of the

lancets and syringes he uses to test his blood glucose levels and administer insulin, respectively, and while at MCYC, he has always placed his sharps in a designated sharps container immediately after using them.

46.    Plaintiff would do the same if living in a group home, such as Defendant Phoenix House's facility.

47.    Montgomery County OCY and Defendant Montgomery County's assistant solicitor reached out to Defendant Phoenix House in the aftermath of Plaintiff's wrongful discharge to see if Phoenix House might be willing to readmit him.

48.    In an email to OCY staff, Plaintiff's guardian ad litem, and Plaintiff's mother, Defendant Montgomery County's solicitor wrote that she "want[ed] to give [Phoenix House] the same grace anyone would need when planning to bring someone home and medically care for them so I'll be discussing what may need to be done to accommodate and how OCY can help." However, she also noted that "[t]he final decision on [Plaintiff] being placed there will be Phoenix House's, not OCY's[.]"

49.    It is unclear what conversations ultimately transpired between Montgomery County OCY and Defendant Phoenix House, or whether Phoenix House engaged in any "planning" to "medically care" for Plaintiff.

50.    Upon information and belief, Defendant Montgomery County's

OCY did not take any steps to ensure that Defendant Phoenix House understood its obligations under the ADA.

51.    Following Plaintiff's discharge from Phoenix House, Montgomery County OCY attempted to place him with multiple providers, but all rejected him.

52.    In total, Plaintiff has been rejected by eight (8) providers in addition to Defendant Phoenix House, five (5) of which explicitly stated they could not serve him because he is a diabetic.

53.    The Children's Home of Easton rejected Plaintiff because it "can not[sic] take youth who are diabetic and inject with insulin" as its staff "are not trained to monitor it[.]"

54.    The Children's Home of Reading stated it rejected Plaintiff because "[u]nfortunately, we do not accept kids with Type 1 diabetes."

55.    Christ's Home rejected Plaintiff because it does not admit diabetics who take insulin; it said it "only would consider him if he was only taking pills for the diabetes."

56.    The Summit Academy stated it rejected Plaintiff because, "due to his Diabetes diagnosis, we cannot accept this youth at this time."

57.    George Junior Republic rejected Plaintiff because its "wellness center [stated] that [it] can no longer accept youth who are diabetic."

58.     Upon information and belief, Community Service Foundation, Aldelphoi, and Bethany Children's Home also rejected Plaintiff because he is diabetic.

59.     Plaintiff has not been offered a foster care placement by Montgomery County OCY and remains in the MCYC.

60.     Over the past month, Plaintiff has been sleeping at his parent's home up to three nights per week, but this arrangement could change at any time due to Plaintiff's behavior while at the MCYC (*i.e.*, Plaintiff not being "on level") or his parents deciding to no longer allow him to come home.

61.     Under both state and federal law, DHS is responsible for overseeing and administering the Commonwealth's child welfare system. *See, e.g.*, 62 P.S. §§ 701, 704.1; 55 Pa. Code § 3130.12; 42 U.S.C. § 622(b)(4)(A) (requiring the state to list the steps it "will take *to provide child welfare services statewide and to expand and strengthen the range of existing services and develop and implement services to improve child outcomes*" (emphasis added)); *Id.* § 629b(a) (requiring each state to draft a state plan where the state agency indicates how it will either administer, or supervise administration of, the state's child welfare system).

62.    Under federal law, each dependent child must have "a case plan designed to achieve placement in a safe setting that is the least restrictive (most family like) and most appropriate setting available and in close proximity to the parents' home, consistent with the best interest and special needs of the child." *Id.* § 675(5)(A).

63.    Defendant Phoenix House is licensed and regulated by DHS, as are the other residential providers who denied Plaintiff admission because he is diabetic.

64.    As the entity tasked with overseeing and administrating Pennsylvania's child welfare system, DHS must develop sufficient services and placements to meet the needs of dependent children with type I diabetes, so that these children can reside in the least restrictive environment and engage in developmentally appropriate activities. *See, e.g.*, 42 U.S.C. § 622(b)(8)(A)(iii)(II); *Id.* § 675a(a)(3) (requiring DHS to ensure that residential settings comply with the "reasonable and prudent parent standard" and provide dependent children with "regular, ongoing opportunities to engage in age or developmentally appropriate activities[.]").

65.    However, it has failed to monitor and evaluate the Commonwealth's child welfare services system to ensure that the system has residential treatment facilities, group homes, foster homes, or other

programs that have the capability and adequate capacity to accommodate the medical needs of dependent children who are type I diabetics. *See id* § 671(a)(7) (requiring DHS to "monitor and conduct periodic evaluations of activities carried out under this part").

66.    Federal law requires DHS to "establish[] and maintain[] standards for . . . child care institutions which are reasonably in accord with recommended standards of national organizations concerned with standards for the institutions or homes, including standards related to admission policies, safety, sanitation, and *protection of civil rights*, and which shall permit use of the reasonable and prudent parenting standard[.]" *Id* § 671(a)(10)(A) (emphasis added).

67.    As the regulatory entity tasked with overseeing Pennsylvania's child welfare system, DHS has taken a "hands off" approach to monitoring the providers it licenses to ensure that they comply with state and federal anti-discrimination laws.

68.    Indeed, the Department of Health and Human Services Office of Civil Rights ("OCR") recently found "systemic deficiencies in DHS's oversight of CYS agencies' Section 504 and Title II policies, practices, and procedures to prevent discrimination against" dependent children with

disabilities.[1]

69.     Upon information and belief, DHS has failed to issue any guidance to the private residential providers it licenses and regulates about how to respond when county OCYs contact them looking to place a dependent youth with type I diabetes.

70.     As a result, these providers maintain blanket, discriminatory policies wherein they refuse to admit type I diabetics, operating under the mistaken belief that DHS's regulations regarding injectable medication, found at 55 Pa Code §§ 3800.187-89, make it impossible for them to accommodate a diabetic.

71.     While 55 Pa Code § 3800.187(a)(5) allows a child to self-administer insulin, § 3800.189(1) specifies that self-administration may only occur when "[a] person who meets the qualifications of § 3800.187(a)(1)-(4) (relating to administration) is physically present observing the administration[.]"

72.     Section 3800.187 allows for injectable medications to be administered by a: licensed medical professional, a nursing school

---

[1] *Voluntary Resolution Agreement Between the U.S. Department of Health and Human Services Office for Civil Rights (OCR) and the Pennsylvania Department of Human Services*, U.S. DEP'T OF HEALTH AND HUMAN SERVICES, (Aug. 4, 2023), available at: https://www.hhs.gov/civil-rights/for-providers/compliance-enforcement/agreements/vra-pennsylvania-department-human-services/index.html.

graduate or student nurse operating under the direct supervision of a professional nurse or nursing school faculty, respectively, or staff member with medication administration training as specified in § 3800.188.

73.    Given the unpredictable nature of type I diabetes, it is impossible to know when an injection may be needed; thus, in practice, providers must have staff who meet the qualifications of § 3800.187(a)(1)-(4) on duty 24/7.

74.    However, via the regulation found at 55 Pa. Code § 3800.22, Defendant Secretary Arkoosh allows providers to seek a waiver of *any* of the regulations to which they are subject.

75.    Section 3800.22 provides that a "facility may submit a written request for a waiver on a form prescribed by the Department, and the Department may grant a waiver of a specific section of this chapter[.]"

76.    Upon information and belief, DHS does not advise providers who lack adequately trained staff to administer injectable medications to dependent youth with diabetes that they can seek a waiver of 55 Pa Code §§ 3800.187-89.

77.    Upon information and belief, DHS also fails to give providers any guidance about where they might seek appropriate training for their staff.

78.     This in turn means that the Commonwealth's child welfare system can offer only restrictive placements, such as the MCYC, to type I diabetics like Plaintiff who cannot be otherwise placed in a foster home or kinship care.

79.     Defendant Secretary Arkoosh could order DHS staff to advise providers to seek a waiver when a county OCY wants to place a dependent type I diabetic in their facility, thereby opening up many residential placement options to these youth.

80.     Defendant Secretary Arkoosh could also ensure that, as a prerequisite to obtaining a license to operate a residential facility in Pennsylvania, providers demonstrate that they understand their obligations under the ADA.

81.     Under state law, the counties operate local children and youth services agencies, which have the power and duty to provide child welfare services. *See* 62 P.S. § 2305.

82.     Pursuant to state law, Defendant Montgomery County is responsible for contracting with private residential facilities, such as Phoenix House, to serve the County's dependent children.

83.     Defendant Montgomery County has entered into contracts with all of the private residential providers who have denied Plaintiff admission

16

to their facilities because he is diabetic.

84.    Defendant Montgomery County is aware that these private providers fail to comply with federal law, as evidenced by an email about Plaintiff sent by Nadine Miller, the Administrator of Montgomery County OCY, to other OCY staff.

85.    In this email, Ms. Miller referenced an email she had received from K.B., Plaintiff's mother, wherein K.B. alleged that Defendant Phoenix House was obligated to accommodate Plaintiff's diabetes and stated: "I believe that these points are all accurate and reasonable accommodations need to be made. This is not unlike the suit brought against another County by the OCR for denying a prospective kinship care provider due to a treated SUD [(substance use disorder)].[2] That resulted in the VRA [(voluntary resolution agreement)] which we, along with all the other Counties and providers, are in the process of complying."

86.    Thus, Defendant Montgomery County, through its ongoing contracts with Defendant Phoenix House, as well as the eight (8) other

---

[2] "OCR" refers to the Office of Civil Rights of the U.S. Department of Health and Human Services, which entered into a Voluntary Resolution Agreement with DHS after it had been accused of failing to comply with Title II of the ADA and Section 504 of the Rehabilitation Act. The Voluntary Resolution Agreement is available here: https://www.hhs.gov/civil-rights/for-providers/compliance-enforcement/agreements/vra-pennsylvania-department-human-services/index.html.

residential providers who denied Plaintiff admission because he is diabetic, is both aiding and perpetuating discrimination against Plaintiff by providing these residential providers with financial assistance and ongoing support.

## V.    Claims for Relief

### Count I
**Plaintiff v. Defendant Phoenix House**
**Violation of Title III of the Americans with Disabilities Act,**
**42 U.S.C. §§ 12181-12189 *et seq.***

87.    Plaintiff incorporates by reference Paragraphs 1 through 86 of this Complaint.

88.    Plaintiff is a type I diabetic and thus has a physical impairment that substantially limits the operation of his pancreas. As such, Plaintiff is a qualified person with a disability as defined by Title III of the ADA and its implementing regulations. 42 U.S.C. §§ 12102(1)(A), 12102(2)(B); 28 C.F.R. §§ 36.105(a)(1)(i), 36.105(b)(1)(i), 36.105(b)(2), 36.105(c)(1)(ii), 36.105(d)(2)(iii)(H).

89.    Defendant Phoenix House is a place of public accommodation covered by Title III of the ADA and its implementing regulations. 42 U.S.C. § 12181(7)(K); 28 C.F.R. § 36.104.

90.    Defendant Phoenix House violated Title III of the ADA, 42 U.S.C. §§ 12182(a), 12182(b)(1)(A)(i), 12182(b)(2)(A)(ii) and its implementing regulations, 28 C.F.R. §§ 36.201(a), 36.202(a), 36.301(a),

36.302(a) when it terminated Plaintiff's residency at its group home because Plaintiff was diabetic and needed to take insulin injections.

91.    Defendant Phoenix House excluded Plaintiff from its premises, thereby denying him full and equal enjoyment of Phoenix House's services.

92.    It further discriminated against Plaintiff when it failed to request a waiver from DHS of the state regulations regarding injectable medications, which, if granted, would have allowed Defendant Phoenix House to accommodate Plaintiff.

93.    Defendant Phoenix House therefore discriminated against and denied Plaintiff the benefits of, and excluded him from participation in, its child welfare program by reason of his disability, in violation of Title III of the ADA.

### Count II
**Plaintiff v. Defendant Secretary Arkoosh**
**Violation of Title II of the Americans with Disabilities Act,**
**42 U.S.C. §§ 12101 *et seq.***

94.    Plaintiff incorporates by reference Paragraphs 1 through 86 of this Complaint.

95.    Plaintiff is a type I diabetic and thus has a physical impairment that substantially limits the operation of his endocrine system and pancreas. As such, Plaintiff is a qualified person with a disability as defined by Title II of the ADA and its implementing regulations. 42 U.S.C. §§

12102(1)(A), 12102(2)(B); 28 C.F.R. §§ 35.108(a)(1)(i), 35.108(b)(1)(i), 35.108(b)(2), 35.108(c)(1)(ii), 35.108(d)(2)(iii)(H).

96.     DHS, which is administered by Defendant Secretary Arkoosh, is a public entity covered by Title II of the ADA and its implementing regulations. 42 U.S.C. § 12131(1)(B); 28 C.F.R. § 35.104.

97.     Plaintiff brings this claim against Defendant Secretary Arkoosh in her official capacity only. Plaintiff seeks only declaratory and injunctive relief on this claim.

98.     Defendant Secretary Arkoosh subjects Plaintiff to discrimination by reason of his disability in violation of the ADA, 42 U.S.C. § 12132, and its implementing regulations at 28 C.F.R. § 35.130.

99.     Defendant Secretary Arkoosh violated and continues to violate Title II by failing to provide adequate oversight of the child welfare system and to develop sufficient services and placements to meet the needs of dependent children with type I diabetes.

100.   More specifically, Defendant Secretary Arkoosh, in overseeing the provision of child welfare services in Pennsylvania, through funding mechanisms and arrangements with counties and private providers, on the basis of Plaintiff's diabetes, unlawfully:

a.    Denies Plaintiff the opportunity to participate in and benefit from child welfare services, including but not limited to group homes;

b.    Affords Plaintiff opportunities to participate in or benefit from child welfare services that are not equal to that afforded to children without diabetes;

c.    Provides Plaintiff child welfare services that are not as effective as those provided to children without diabetes; and,

d.    Limits Plaintiff in the enjoyment of the rights, privileges, advantages, and opportunities enjoyed by others receiving their child welfare services, including stability and permanency, community-based services and placements, and appropriate treatment. 42 U.S.C. §§ 12101(a)(2) and (a)(5), 12132; 28 C.F.R. §§ 35.130(a), 35.130(b)(1)-(2).

101.    In addition, Defendant Secretary Arkoosh, in her failure to provide adequate oversight of the provision of child welfare services in Pennsylvania, has utilized methods of administration that have the effect of subjecting Plaintiff and other dependent children with diabetes to

discrimination on the basis of their diabetes and that perpetuates the

discrimination of Defendant Montgomery County. 42 U.S.C. § 12132; 28

C.F.R. §§ 35.130(b)(3)(i), 35.130(b)(3)(iii).

## **Count III**
### Plaintiff v. Defendant Montgomery County
### Violation of Title II of the Americans with Disabilities Act,

102.   Plaintiff incorporates by reference Paragraphs 1 through 86 of

this Complaint.

103.   Defendant Montgomery County is a public entity subject to the

requirements of Title II of the ADA and its implementing regulations. 42

U.S.C. § 12131(1)(A); 28 C.F.R. § 35.104.

104.   Defendant Montgomery County subjects Plaintiff to

discrimination by reason of his disability in violation of the ADA, 42 U.S.C. §

12132, and its implementing regulations at 28 C.F.R. § 35.130.

105.   Specifically, Defendant Montgomery County violates Title II by

aiding and perpetuating Defendant Phoenix House's discrimination of

Plaintiff. 42 U.S.C. § 12132; 28 C.F.R. § 35.130(b)(1)(v).

106.   Defendant Montgomery County further violates Title II by

continuing to maintain contracts with the eight (8) other residential

providers who denied Plaintiff admission because he is diabetic. 42 U.S.C.

§ 12132; 28 C.F.R. § 35.130(b)(1)(v).

107.  Defendant Montgomery County further violates Title II by failing to modify its policies and procedures to enable Plaintiff to fully participate in its child welfare program. 42 U.S.C. § 12132; 28 C.F.R. § 35.130(b)(7)(i).

108.  Specifically, Defendant Montgomery County has failed to provide either Defendant Phoenix House, or any of other private residential providers which rejected Plaintiff because he is diabetic, with the needed staffing that would enable these providers to serve him.

109.  Defendant Montgomery County has further discriminated against Plaintiff by keeping him in an overly restrictive setting, simply because he is a diabetic. Defendant Montgomery County has failed to provide Plaintiff with child welfare services in the most integrated setting appropriate to his needs, *i.e.*, a foster home or group home, and instead is unnecessarily segregating him at the MCYC. 42 U.S.C. § 12132; 28 C.F.R. § 35.130(d).

## VI.   <u>Relief</u>

Plaintiff respectfully requests that this Court:

    a.    Exercise jurisdiction over this action;

    b.    Issue appropriate declaratory and injunctive relief;

    c.    Award reasonable attorneys' fees, litigation expenses, and costs; and

    d.    Grant such other relief as may be appropriate.

Date: April 9, 2024        **Respectfully Submitted**,

By:   */s/* Rhonda Brownstein
        Rhonda Brownstein (PA I.D. No. 46866)
        Disability Rights Pennsylvania
        1800 John F. Kennedy Boulevard
        Suite 900
        Philadelphia, PA 19103
        Office: 215-238-8070
        Fax: 215-772-3126
        rbrownstein@disabilityrightspa.org

        */s/* Alexandra Hermann
        Alexandra Hermann (PA I.D. No.329343)
        Disability Rights Pennsylvania
        1800 John F. Kennedy Boulevard
        Suite 900
        Philadelphia, PA 19103
        Office: 215-238-8070
        Fax: 215-772-3126
        ahermann@disabilityrightspa.org

        *Counsel for Plaintiff*